IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 26, 2005

## STATE OF TENNESSEE v. JAMES THOMAS MANNING

**Direct Appeal from the Criminal Court for Putnam County**
**No. 98-0121     Leon C. Burns, Jr., Judge**

_____

**No. M2004-03035-CCA-R3-CD - Filed January 24, 2006**

_____

On April 15, 1998, the Putnam County Grand Jury indicted Defendant, James Thomas Manning, on one count of aggravated burglary, two counts of aggravated rape, one count of attempted aggravated sexual battery, and one count of aggravated robbery. Following a jury trial, Defendant was convicted of two counts of aggravated rape, a Class A felony, and one count of aggravated burglary, a Class C felony. The jury acquitted Defendant of attempted aggravated sexual battery and could not reach a verdict on the aggravated robbery charge. Defendant received concurrent twenty-five year sentences for each of the aggravated rape convictions, and a consecutive six year sentence for the aggravated burglary conviction, for an effective thirty-one year sentence. These sentences were ordered to be served consecutively to a prior sentence out of Sumner County being served by Defendant at the time of trial and sentencing. In his appeal, Defendant argues that the trial court erred by (1) denying his motion to strike expert testimony for failure to lay a proper foundation; (2) excluding evidence that the victim had pending charges for aggravated assault; (3) violating double jeopardy principles in allowing Defendant to be convicted of two counts of aggravated rape; and (4) imposing consecutive sentences. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

David Neal Brady, District Public Defender; and H. Marshall Judd, Assistant Public Defender, Cookeville, Tennessee, for the appellant, James Thomas Manning.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William Edward Gibson, District Attorney General; David A. Patterson, Assistant District Attorney General; and Benjamin W. Fann, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

The facts developed at trial and taken in a light most favorable to the state are as follows:

In the early morning hours of February 10, 1997, the victim, Charlotte Bridgeforth, was at home asleep, when she awoke to a loud "banging" noise. The victim's husband at the time, Greg McMurry, told her that he thought the noise was an intruder. They heard the noise again and the victim's husband, believing the noise was the drug task force, went to the master bathroom and hid in the shower behind the shower curtain. Defendant entered the backdoor, walked through the utility room and the kitchen and looked down into the bedroom where the victim was standing. Defendant was wearing a toboggan pulled down over his face, a black leather coat, pants, and solid white tennis shoes. He pointed a gun at Ms. Bridgeforth and she began screaming.

Defendant entered the bedroom where the victim was standing and began yelling at her and telling her to "shut up." Defendant pointed the gun at the victim's temple and kept repeating "give me the money and the stuff." Defendant asked, "[W]here's Greg at?" and the victim responded, "I don't know." Defendant asked, "[W]here's his cars at? [W]here's the jewelry at? You better beep him." The victim explained to Defendant that Greg had been "busted" by the police for selling drugs and they took "everything" so she could not beep Greg nor could she give Defendant "the stuff." During this time, Greg was hiding in the bathroom shower adjacent to the bedroom where Defendant and the victim were located.

Ms. Bridgeforth gave Defendant her mortgage money in the amount of two hundred and fifty dollars. When she could not meet Defendant's other requests, he first tried to shove her into the bathroom closet and then the bedroom closet. When those attempts failed, Defendant ordered Ms. Bridgeforth to take off her clothes. Defendant then ordered the victim sit down on the bed and perform oral sex on him. After a few minutes, Defendant told the victim that she was not doing it right and she "better do it right." He then told her to lie back on the bed and he laid on top of her and proceeded to have vaginal intercourse with her until he ejaculated. Defendant continued to hold a gun to the victim's head throughout the attack. The victim testified that she complied with all of Defendant's requests because she did not want to be killed.

After raping Ms. Bridgeforth, Defendant told her to "get the gold." She gave him a gold bracelet valued at approximately two hundred dollars, and a gold necklace valued at approximately sixteen hundred dollars. After taking the jewelry from the victim, Defendant tied her hands behind her back using telephone cord from the victim's home telephones. After tying her wrists, Defendant put the victim on the rug in the bathroom where her husband was hiding. He told her "I'm not going to hurt your kids," then ordered her to remain in the bathroom for fifteen minutes. The telephone cord was introduced at trial along with photographs illustrating bruises on the victim's wrists caused by the cord.

Shortly after Defendant left the bathroom, the victim heard her fourteen year old daughter screaming. The victim's husband untied the cord around her wrists so that she was able to leave the bathroom and find her daughter. Her daughter testified that Defendant entered her bedroom and ordered her to take her clothes off. He began fumbling with his zipper as if to take his pants off, but stopped when she informed him that she had her "period." Defendant ordered her to get out of bed and get in the hall closet. The child did as she was told and Defendant left the house.

At approximately 1:05 a.m., Sgt. Jim Eldridge of the Putnam County Sheriff's Department responded to a call from the victim's home. Sgt. Eldridge testified that he was the first officer to respond to the call. Upon arrival, he noticed that the backdoor to the home had been "kicked in" from the outside. The outside frame of the backdoor was splintered and had a large size footprint dent just below the doorknob. Sgt. Eldridge proceeded into the home where people were crying and upset. He secured the scene and tried to calm the victim to find out what had happened. Sgt. Eldridge described the victim as distraught and in shock. He stated that the house was generally clean and orderly and the only sign of major destruction was the damage to the backdoor.

Charlotte Bridgeforth, her daughter, and Greg McMurry, were the only individuals present when Sgt. Eldridge arrived at the scene. Shortly thereafter, the Putnam County Ambulance Service transported Ms. Bridgeforth to Cookeville Regional Medical Center for medical treatment. Sara Robinson, a licensed practical nurse (LPN) from the medical center, testified that the hospital completed a rape kit on the victim. Specifically, the hospital took vaginal swabs, oral swabs, combings, and blood from the victim. Photographs were taken of bruises on the victim's wrists. This evidence was later sent to the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis.

Detective David Andrews of the Putnam County Sherriff's office was involved in the collection of evidence both from the crime scene and from the victim. Detective Andrews testified that he received the rape kit from the hospital and submitted it to the TBI Crime Lab. According to the lab's analysis of the rape kit, both semen and sperm were present on the victim. After receiving these results, Detective Andrews took blood samples from Defendant and submitted them to the crime lab for a DNA comparison to the sperm and semen found on the victim.

Margaret Bash, a forensic serologist at the TBI Crime Lab, provided expert testimony regarding the procedure for conducting DNA analysis. She also testified regarding the results of the DNA comparison in the present case. She explained that the main goal in DNA analysis is to compare two samples, one from a known source and one from an unknown source, to determine if serological material from the unknown source could have come from a known individual. Ms. Bash further explained that the DNA analysis in the present case was conducted to determine whether Defendant contributed the semen and sperm found on the vaginal swabs taken from the victim.

As part of her testimony at trial, Ms. Bash simulated the DNA comparison between Defendant's blood, the victim's blood, and the vaginal swab taken from the victim on the night she was raped. In her initial findings and at trial, Ms. Bash found that the DNA in Defendant's blood sample contained "a good match" to the DNA found in the semen from the vaginal swab. Ms. Bash

did not testify as to Defendant's guilt, but she testified regarding the statistical probabilities that someone unrelated to Defendant committed the crime. Specifically, Ms. Bash testified that the "the probability of selecting an unrelated individual at random having the same DNA profile for the Caucasian population is approximately 1 in 490 billion. And from the black population, it's approximately 1 in 212 billion." At the close of all the proof, defense counsel moved to strike the testimony regarding statistical probabilities on the grounds that a proper foundation had not been laid for introduction of such evidence. The judge denied the motion and allowed the testimony to remain in the record.

## II. Admission of DNA Probability Evidence

Defendant argues that the trial court erred by not granting his "motion to strike" the expert testimony of TBI forensic serologist, Margaret Bash, for failure to lay a proper foundation. Defendant does not dispute the serologist's expert qualifications, but argues that the State failed to lay a proper foundation for introduction of the DNA testimony and the statistical probabilities related to the accuracy of the DNA comparison. Defendant offers no basis for why the foundation is lacking and fails to explain what would constitute an adequate foundation. Defendant did not contemporaneously object to this evidence, but moved to strike the testimony at the conclusion of all the proof. As a general rule, the failure of a defendant to interject a contemporaneous objection waives consideration by this Court of the issue on appeal. *See* Tenn. R. App. P. 36(a); *Teague v. State,* 772 S.W.2d 915, 926 (Tenn. Crim. App. 1988); *State v. Killebrew,* 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988). Nevertheless, we briefly address Defendant's contention that the statistics relating to the accuracy of the DNA comparison were improperly admitted.

The expert explained that the purpose of the DNA analysis in the present case was to make a determination of whether the sperm and semen from Ms. Bridgeforth's vaginal swab contained the same DNA as the blood given by Defendant. She explained that DNA is human genetic material unique to every individual. She further explained that the testing method used was Restriction Fragment Length Polymorphism (RFLP) analysis, the state of the art method for testing DNA at the time of the investigation of this case. Ms. Bash testified about the manner in which she created stain cards from Defendant's blood sample and the vaginal swab from the victim. She placed the stain cards in a chemical solution which caused the DNA to release from the card samples in various sizes. She then took the DNA samples, an additional universally known DNA sample, and a control sample of her own DNA and placed them in a gel. The additional samples were added to verify the accuracy of the test results. She then subjected the samples to electrophoresis, an electric current, which caused the DNA to separate out by different size molecules. Those molecules were then embedded on a nylon membrane. At this point, Ms. Bash conducted a series of probes, each specific to a different point on five different chromosomes. She then made a visual comparison and found a "good match" between the DNA bands from the vaginal swab and the DNA bands from Defendant's blood. Ms. Bash testified that the match was accurate and no mistakes were made in the analysis.

The results of the DNA analysis were entered into a computer data base of collected DNA profiles. A frequency was assigned to each of the bands from Defendant's DNA sample. The

program then calculated the rarity with which this particular DNA profile occurs. Based on these calculations, Ms. Bash testified that the probability of randomly selecting an unrelated individual with the same DNA profile as Defendant was approximately 1 in 490 billion in the Caucasian population and 1 in 212 billion in the African-American population.

In Tennessee, the admissibility of expert testimony as to scientific or technical evidence is governed by Tennessee Rules of Evidence 702 and 703. *See, e.g., State v. Coley,* 32 S.W.3d 831, 834 (Tenn.2000); *State v. Begley,* 956 S.W.2d 471, 475 (Tenn.1997). Generally the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent a clear abuse of that discretion. *State v. Ballard,* 855 S.W.2d 557, 562 (Tenn. 1993). The Tennessee Supreme Court has set forth specific principles to guide trial courts in determining whether to admit scientific or technical evidence. *Begley*, 956 S.W.2d at 475. First, the evidence must be relevant to a fact at issue in the case. *Id.* (*citing* Tenn. R. Evid. 401, 402). Second, the expert must be qualified by specialized knowledge, skill, experience, training or education in the field of expertise, and the testimony in question must substantially assist the trier of fact to understand the evidence or determine a fact in issue. *Id.* (*citing* Tenn. R. Evid. 702; *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d. 257, 264 (Tenn. 1997)). Finally, when the expert witness offers an opinion or states an inference, the underlying facts or data upon which the expert relied must be trustworthy. Tenn. R. Evid. 703; *McDaniel,* 955 S.W.2d at 264.

Tennessee has statutorily addressed the issue of the admission of scientific or technical evidence relating to DNA analysis. T.C.A. § 24-7-118 (2000). In 1991, the General Assembly enacted a statute to admit DNA evidence "without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material." T.C.A. § 24-7-118(b)(1) (2000). This statute conditions full admission of DNA analysis into evidence "upon a showing that the offered testimony meets the standards of admissibility set forth in the Tennessee Rules of Evidence." *Id.; State v. Scott* 33 S.W.3d 746, 758 (Tenn. 2000). "Because DNA evidence is statutorily regarded as trustworthy and reliable, it is exempted from the trial court's determination under Rule 703 of the Rules of Evidence of whether it provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material." *State v. Spratt,* 31 S.W.3d 587, 604 (Tenn. Crim. App. 2000). The statute also provides that statistical population frequency evidence, based on genetic or blood test results, is admissible in evidence to demonstrate the fraction of the population that would have the same blood type or DNA. *See* T.C.A. § 24-7-118(c).

Based upon our examination of the record, we conclude that the trial court did not err in admitting the statistical probability evidence. The evidence of the DNA analysis was clearly relevant because it tended to make more probable the fact that Defendant raped Ms. Bridgeforth. *See* Tenn. R. Evid. 401. In addition, the forensic serologist was qualified and accepted by the court as an expert with "knowledge, skill, experience, training, or education" in this field, and the expert's specialized knowledge no doubt substantially assisted the jury in determining the identity of the perpetrator. *Id.; see also State v. Begley,* 956 S.W.2d 471, 476-77 (Tenn. 1997). Finally, as stated above, DNA evidence is statutorily regarded as trustworthy and reliable. As such, the requisite foundation was

laid for admitting the DNA statistical probabilities into evidence. Accordingly, we find that the evidence of DNA analysis met the general standards under the Rules of Evidence concerning the admission of scientific or technical evidence.

Defendant was not prohibited from challenging the particular tests at issue in this case. As Tennessee Code Annotated section 24-7-118(c) indicates, the statute was carefully drafted to ensure that it would not be "construed as prohibiting any party in a civil or criminal trial from offering proof that DNA analysis does not provide a trustworthy and reliable method of identifying characteristics in an individual's genetic material." Indeed, Defendant took advantage of this provision of the statute when he cross-examined the expert as to the lack of trustworthiness and reliability of such analysis. For these reasons, we hold that the trial court did not abuse its discretion in allowing the statistical probability evidence to be admitted.

## III. Prior Bad Acts

Defendant next asserts that the trial court erred in excluding evidence that the victim had been charged with aggravated assault in an unrelated incident. In a jury out hearing, the victim admitted that she had been charged with aggravated assault on January 30, 1999, for pulling a knife on Ms. Devita Jones and cutting Ms. Jones across the face. Defendant sought to admit the evidence as probative of the victim's character for truthfulness.

Tennessee Rule of Evidence 608(b) provides, "specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . , be inquired into on cross-examination." Tenn. R. Evid. 608(b). Before allowing such cross-examination to take place, the trial court, upon request, must hold a hearing outside the presence of the jury to determine whether the probative value of the alleged conduct outweighs its prejudicial effect and whether there is a factual basis for the inquiry. *Id.*; *State v. Morgan*, 541 S.W.2d 285, 390 (Tenn. 1976).

In the present case, the trial court, having conducted the requisite hearing out of the presence of the jury, found the fact that the victim was charged with aggravated assault in January 1999, did not "touch on the character [of the victim] for truthfulness or untruthfulness." This Court has previously held that evidence of a victim's prior arrest for assault was not admissible under 608(b) because the victim's act of assaulting the defendant was not probative of the victim's character for truthfulness or untruthfulness. *State v. Neblett,* No. M2002-01494-CCA-R3-CD, 2003 WL 21145540, at *3 (Tenn. Crim. App. May 19, 2003), *perm. to app. denied* (Tenn. 2003). In the present case, we likewise conclude that the act of assaulting an individual other than Defendant in an unrelated incident is not probative of the victim's character for truthfulness or untruthfulness. *Id.; See* Tenn. R. Evid. 608(b). As such, the trial court did not err in excluding evidence of the victim's assault charges, and Defendant is not entitled to relief on this issue.

## IV. Double Jeopardy

Defendant next argues that the trial court erred in failing to grant his motion to merge, or strike one of, his two convictions for aggravated rape. Defendant argues that his convictions are multiplicitous and failure to grant the motion violated the prohibition against double jeopardy.

The double jeopardy clause in the United States Constitution provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. CONST. amend. V. Similarly, the Tennessee Constitution states that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. The constitutional right against double jeopardy protects against (1) a second prosecution after an acquittal; (2) a second prosecution after a conviction; and (3) multiple punishments for the same offense. *State v. Beauregard*, 32 S.W.3d 681, 682 (Tenn. 2000). It is the third category that we are concerned with in the present case.

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." *State v. Phillips,* 924 S.W.2d 662, 665 (Tenn. 1996). In *Phillips,* the Tennessee Supreme Court explained that, in determining whether offenses are "stacked" so as to be multiplicitous, the following principles should be considered:

(1)      A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;

(2)      If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and

(3)      Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act. *Id.* at 665 (citations omitted). The *Phillips* court noted that the following factors are also significant in determining whether sexual offenses are multiplicitous:

      (1)      The nature of the act;
      (2)      The area of the victim's body invaded by the sexually assaultive behavior;
      (3)      The time elapsed between the discrete conduct;
      (4)      The accused's intent, in the sense that the lapse of time may indicate a newly formed intent to again seek sexual gratification or inflict abuse; and
      (5)      The cumulative punishment.

*Id.* The *Phillips* court noted "that the presence or absence of any one factor or a combination of them other than the nature of the act is not determinative of the issue." *Id.* The court also observed that, "although separate acts of intercourse may be so related as to constitute one criminal offense, generally rape is not a continuous offense, but each act of intercourse constitutes a distinct and separate offense." *Phillips*, 924 S.W.2d at 664-65 (citation omitted).

As relevant here, Tennessee Code Annotated section 39-13-502(a)(1) (2003) defines aggravated rape as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim" where "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon . . . ." This Court has previously held that "an accused may be convicted of more than one offense when the rape involves separate acts" of sexual penetration. *State v. Burgin,* 668 S.W.2d 668, 670 (Tenn. Crim. App. 1984). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7) (2003). The *Phillips* court noted that each act "is capable of producing its own attendant fear, humiliation, pain, and damage to the victim," and "each type of penetration requires a purposeful act on the part of the perpetrator." *Phillips,* 924 S.W.2d at 665.

In *Phillips,* the Tennessee Supreme Court upheld three convictions for aggravated rape where the defendant inserted a plastic object into the victim's vagina; he performed cunnilingus; and he forced her to engage in vaginal intercourse. *Id.* at 663-64. The supreme court found that the defendant committed three separate offenses because each act involved three instances of sexual penetration, lasted approximately three hours, and required different body positions and engaged different body parts. *Id.* at 665. In *State v. Kendrick,* 38 S.W.3d 566, 569 (Tenn.2001), the Tennessee Supreme Court applied the *Phillips* factors and concluded that the defendant committed two separate and distinct offenses after the proof showed that the defendant forced the victim to perform fellatio on him and then forced the victim to have vaginal intercourse.

In *State v. Barney,* 986 S.W.2d 545, 549-50 (Tenn. 1999), the Tennessee Supreme Court applied the *Phillips* factors in determining whether the acts of aggravated sexual battery and rape of a child were discrete acts that justified separate convictions. The *Barney* court upheld the convictions finding that touching a penis with the hand is distinguishable from touching a penis with the mouth, and "the acts, although close in time, were not performed simultaneously." *Id.* at 550. In *State v. Waters,* M2001-02682-CCA-R3-CD (Tenn. Crim. App. at Nashville, Jan. 30, 2003), *perm. app. denied* (Tenn. 2003), this Court upheld the defendant's two convictions for aggravated rape after the evidence showed that the defendant forced the victim to perform fellatio on him twice, five minutes apart. The court concluded that, "[u]nder the circumstances, each act of forced fellatio was capable of producing its own 'fear, humiliation, pain, and damage to the victim." *Id.* (citation omitted).

However, in *State v. Arnett,* No. 03C01-98110-CR-00395 (Tenn. Crim. App., at Knoxville, Feb. 2, 2000), *aff'd,* 49 S.W.3d 250 (Tenn. 2001), this Court merged the defendant's two convictions

for aggravated rape, holding that the separate convictions violated double jeopardy principles. The court explained:

> Clearly, the penetrations invaded the same body area of the victim, with only seconds elapsing between the two penetrations. Obviously, from the victim's testimony, the digital penetration was merely the means of completing the penile penetration. We are unable to conclude that the intervening seconds between the penetrations provided a sufficient lapse of time so as to permit the development of "a newly formed intent" as the digital penetration only served to facilitate the penile penetration.

*Id.* (citing *Phillips,* 924 S.W.2d at 665).

In the present case, the record reflects that Defendant ordered the victim to remove her clothes, sit down on the bed, and perform fellatio on him. When he was dissatisfied with her performance in this regard, he instructed her to lie back on the bed. Defendant then laid on top of the victim and proceeded to vaginally penetrate her with his penis until he ejaculated. The victim testified that she didn't know how much time elapsed, but it felt like "forever."

Applying the *Phillips* factors in the present case, we conclude that Defendant's acts of sexual penetration were separate and discrete acts constituting two separate offenses. It is our determination that each penetration was the product of a discrete and purposeful act on the part of Defendant. Each act of sexual penetration involved a different body party and each required both Defendant and the victim to be in a different position. The different nature of each penetration is indicative of Defendant's separate intent to conduct each act. *Phillips*, 924 S.W.2d at 665. Although it is unclear how long the incident lasted, the record indicates that each act lasted more than a few seconds. We find that each act "is capable of producing its own attendant fear, humiliation, pain, and damage to the victim," and "each type of penetration requires a purposeful act on the part of the perpetrator." *Id.* We therefore conclude that Defendant was properly convicted of two counts of aggravated rape, and these convictions do not violate the prohibition against double jeopardy. Defendant is not entitled to relief on this issue.

## V. Consecutive Sentencing

Defendant argues that the trial court improperly imposed consecutive sentences because the sentence he received was not in proportion to the severity of his offense. The trial court sentenced Defendant to twenty-five (25) years for both aggravated rape convictions, to run concurrently; six (6) years for the aggravated burglary conviction, to run consecutively; and both sentences to be served consecutively to the Sumner County sentence Defendant was serving at the time of the sentencing hearing in this case.

When an accused challenges the length, range, or manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations

made by the trial court are correct. T.C.A. § 40-35-401(d) (2003); *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *Ashby*, 823 S.W.2d at 169. When conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at trial and the sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the Appellant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. T.C.A. §§ 40-35- 102, -103, -210 (2003); *Ashby*, 823 S.W.2d at 168. Furthermore, facts relevant to sentencing must be established by a preponderance of the evidence and not beyond a reasonable doubt. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn.2000).

If our review reflects that the trial court, following the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact that are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn.Crim.App.1991). However, where the trial court fails to comply with the statutory provisions of sentencing, appellate review is de novo without a presumption of correctness. The general principles of sentencing require that the length of sentence be "justly deserved in relation to the seriousness of the offense" and "be no greater than that deserved for the offense committed." *State v. Imfeld,* 70 S.W.3d 698, 708 (Tenn. 2002) (citing T. C. A. §§ 40-35-102(1) and -103(2)).

Defendant challenges his consecutive sentences on the grounds that he was sentenced as a dangerous offender, and the trial court made no finding that the sentence was reasonably related to the seriousness of the offense. In support of his argument, Defendant relies on *State v. Wilkerson,* 905 S.W.2d 933 (Tenn.1995). In *Wilkerson,* our supreme court held that where a defendant is found to be a dangerous offender, the imposition of consecutive sentences requires not only the application of general sentencing principles, but the additional findings that "an extended sentence is necessary to protect the public against further criminal conduct by the defendant[,] and the consecutive sentences must reasonably relate to the severity of the offenses committed. *Id.* at 939. Defendant does not argue that the general sentencing principles were not properly applied. He argues only that the trial court failed to meet the additional requirement of finding that the consecutive sentence reasonably relates to the severity of the crime.

The trial court found that consecutive sentencing was justified in light of Defendant's extensive criminal record, misdemeanor assault convictions, the fact that this crime was committed while Defendant was on probation, and the need to incarcerate Defendant for a "substantial period of time to protect society from potential harm." Even if the trial court failed to explicitly state that the consecutive sentence was reasonably related to the severity of the crime, the sentence is valid on other grounds. Pursuant to Tennessee Code Annotated section 40-35-115, "when a defendant is convicted of more than one offense, "[t]he court may order sentences to run consecutively if the court finds by a preponderance of the evidence that . . . [t]he defendant is an offender whose record

of criminal activity is extensive," or "[t]he defendant is sentenced for an offense committed while on probation." *See* T.C.A. § 40-35-115(b)(2), (6) (2003). Defendant does not dispute that he was on probation when he committed the offenses in the case sub judice. Nor does he dispute the trial court's finding that he had an extensive criminal record. As such, we conclude the trial court did not err in ordering the sentences to be served consecutively. The aggregate sentence was reasonably related to the seriousness of the offense and was not greater than that deserved. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE