IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 7, 2008

## R. L. WILLIAMS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2002-B-1093     Steve Dozier, Judge**

---

**No. M2007-02328-CCA-R3-PC - Filed January 6, 2009**

---

The petitioner, R. L. Williams, appeals from the denial of his 2007 petition for post-conviction relief, which challenged his 2003 rape convictions. He asserts that he was denied the effective assistance of counsel at trial because trial counsel failed to effectively challenge the DNA evidence, which he posits was the only convicting evidence because the testimony of the victim was unreliable. Holding that he has failed to establish that his counsel was ineffective, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Patrick G. Frogge, Nashville, Tennessee, for the appellant, R. L. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Brian Holmgren and Katherine Scarminach, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

A Davidson County Criminal Court jury convicted the petitioner of one count of rape by force and one count of rape without consent. The trial court sentenced the defendant to 12 years' imprisonment for each conviction and ordered that the sentences be served concurrently. *See State v. R. L. Williams*, No. M2004-02075-CCA-MR3-CD, slip op. at 3 (Tenn. Crim. App., Nashville, Dec. 16, 2005), *perm. app. denied* (Tenn. 2006). The petitioner filed a timely appeal to this court, and we affirmed the petitioner's conviction for the first count of rape and the accompanying 12-year sentence, but we "remanded to the trial court with instruction to enter corrected judgment forms which reflect that the [petitioner's] conviction in Count 2 is merged with his conviction for forcible rape under Count 1." *Id.*, slip op. at 4, 7. Following the denial of his application for permission to

appeal to our supreme court on May 1, 2006, the petitioner filed a timely petition for post-conviction relief, alleging ineffective assistance of counsel.

The evidence, as summarized by this court on direct appeal, established that the Tennessee Department of Children's Services ("DCS") placed the victim, L.S.[1], in the foster care of the petitioner and his wife in 1987. *Id.*, slip op. at 2. On November 30, 1999, the victim had left work in order to watch over the petitioner's one-year-old biological daughter because the petitioner's wife had hurt her neck and had to go to the hospital. *Id.* The petitioner arrived at the house at approximately 9:00 p.m., and he went to the living room to watch television with the victim and his biological daughter. *Id.* A program on the television made the victim "uncomfortable," and she "removed the little girl from the room and started playing with her in the hallway." *Id.* The evidence showed,

> As the victim was bent over playing with the child, the [petitioner] grabbed her from behind and wrapped his leg around her to prevent her from moving. Despite her requests and pleas to stop, the [petitioner] pulled down the victim's pants and penetrated her vaginally with his penis. Afterwards, the victim locked herself in the bathroom. When she emerged she found the [petitioner] waiting for her. He asked her if she needed anything and told her that no one would believe her if she told what had happened.

*Id.*

The victim testified that she was unable to tell the petitioner's wife about the incident because the petitioner was always present. *Id.* At school, she discussed the matter with her biological sister, who also lived under the petitioner's foster care, and "the sister became upset and began to make a scene in the classroom. At that point, the victim stated she told her sister that it never happened." *Id.* A teacher noticed that the victim "was visibly upset and began questioning her." *Id.* The victim then told the teacher what had happened, and "a school police officer took the victim to the hospital for an examination." *Id.*

At the hospital, a forensic examination showed the presence of spermatozoa. *Id.* The victim was removed from the petitioner's foster care and moved to "a group care facility for juveniles with problems, because no other foster care could be found." *Id.* She testified that "she felt like a prisoner . . . in addition to being separated from her family and friends." *Id.* The victim called the petitioner's sister-in-law "who told her that if she cleared up the situation, she could return to the [petitioner's] home." *Id.* Because of this conversation, the victim wrote a letter to DCS "claiming that the events had never occurred, that she had just dreamed it." *Id.* At trial, the victim "maintained that she was raped by the [petitioner]." *Id.*

---

[1] It is the policy of this court to identify victims of sex abuse by their initials in order to protect the victim's identity.

A forensic analysis of the deoxyribonucleic acid ("DNA") from the spermatozoa found in the victim's vagina showed that five of the 13 "locations" examined and the "gender marker for a DNA profile" matched the petitioner's DNA profile. *Id.*, slip op. at 3, n.2. The evidence established that "the probability of the sperm being from another African American other than the [petitioner] was 1/3,517,000, from a Caucasian person other than the [petitioner] was 1/10,790,000, from a Southeastern Hispanic other than the [petitioner] was 1/3,812,000, and from a Southwestern Hispanic was 1/5,552,000." *Id.*, slip op. at 3. The petitioner is an African American. *Id.*, slip op. at 6, n.3.

The petitioner chose not to testify and presented no defense proof.

The petitioner filed a timely petition for post-conviction relief on May 1, 2007, alleging ineffective assistance of counsel. The petitioner argues that his trial counsel "was constitutionally deficient, and that deficient performance was prejudicial." He alleged as deficiencies: (1) that counsel failed to file a motion to suppress the "unconstitutional seizure" of the petitioner's DNA; (2) that counsel failed to "effectively challenge" the DNA evidence by failing to challenge its veracity, by failing to challenge the method of testing and comparing DNA according to *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997), and by failing to challenge the evidentiary chain of custody; (3) that counsel failed to investigate the victim's background; (4) that counsel "was ineffective where he failed to offer any proof of L.S.'s numerous recantations at trial"; and (5) that the "cumulative effects" of counsel's errors denied the petitioner effective assistance of counsel.

In the August 2, 2007 evidentiary hearing, the petitioner first called Joe Minor, Tennessee Bureau of Investigation special agent scientist supervisor. Agent Minor evaluated the DNA evidence that eventually resulted in the petitioner's conviction. He testified that he examined a "blood standard" from both the petitioner and the victim and the vaginal swabs that were submitted to the laboratory from the sexual assault kit performed on the victim.

Agent Minor testified that he placed a portion of the vaginal swab into a chemical that performed an "extraction procedure" that extracted the DNA. He testified that the TBI laboratory had used the same DNA procedures since 1998. He stated that the "ideal" sample of DNA was one nanogram, or "a billioneth [sic] of a gram." Agent Minor, however, had tested amounts less than one nanogram. He said, "[T]here is [sic] some circumstances where we might think that the quantitation [sic] may not be accurate enough and, then, we'll proceed with testing that." He stated that the "cutoff" in which he would not perform tests on a DNA sample was "zero," meaning no detectable amount of DNA.

Agent Minor testified that, in this case "we separated the sperm DNA from the female DNA . . . the sperm DNA concentrated at point zero six two nanograms." He stated that he then "amplified" the .062 nanogram sample using "a technique called PCR amplifying chain reaction" and that this procedure had "been in effect for many years." He testified, "[T]he PCR procedure targets specifics [sic] locations and amplifies, or replicates, the DNA which allows us to . . .

subsequently analyze that on a three ten genetic analyzer, an instrument that produces DNA types." The 310 genetic analyzer is a "capillary electrophoresis device" that Agent Minor used "to separate those short tandem repeat fragments . . . by size," and the instrument used software to aid in "measuring those fragments links." Agent Minor testified, "The policy of the TBI [], though, is to use the [software] and actually go in and look at the raw data and, you know, verify that the types are there and artifacts or anything can be accounted for. So, we don't rely totally on that [software]."

Agent Minor testified that DNA readings can be affected by "artifacts," which include "spikes . . . due to products in the polymer . . . that's injected inside the capillary" and "stutter peaks." He said, "An artifact is something that should be accountable for. If you cannot account for an artifact and you're gonna take that sample and reamplify it and re-run it." He agreed that any contamination in the DNA sample would be amplified by the amplification process; however, the TBI laboratory had procedures and policies in effect to protect against such contamination. He further testified that, to his knowledge, the TBI laboratory had never committed any errors in DNA analysis that led to an incorrect identification.

Agent Minor explained, "There are thirteen loci that are standard amongst the DNA labs. And, those fragment links that are found, short tandem repeats, that are found in those locations have been analyzed by statistical methods, which will allow you to make a statistical analysis of particular types of loci." He explained that, the greater number the of matching loci, the more likely that the DNA belongs to an individual. He testified that, in this case, the defendant's DNA matched five loci of the DNA found from the vaginal swab of the victim and that the possibility that the offender was an African American other than the defendant was one in 3,500,000. To arrive at this statistic he used the "product rule" which is a "well founded mathmatical [sic] procedure." He stated that his results did not "factor[] any potential error" because "that's not part of the rule." He testified that he was not familiar with any "rate of error" in short tandem repeat DNA testing. Agent Minor also stated that "in order to enter a profile into the [Federal Bureau of Investigation's] national data base, there is a requirement to have attempted to type all the thirteen loci that are available, a minimum requirement of submitting ten on line." He admitted that the DNA profile used to convict the petitioner would not qualify for entry into the Federal Bureau of Investigation's database.

On cross-examination, Agent Minor testified that, although .062 nanograms is a small amount of DNA, he has "typed" smaller amounts. He stated that he asked a second agent to perform the DNA analysis, and the second agent arrived at the same conclusion. He agreed there was no reason that he "would exclude the petitioner in this case" because his DNA profile showed five loci matches with the DNA found in the sexual assault kit. He stated that "[t]hese were very reliable results."

Counsel testified that he was retained by the petitioner's family and that he represented the defendant in October 2003. Counsel had practiced law for 25 years and participated in 10 rape trials at the time of the petitioner's trial. He stated that he did not hire a private investigator in this case; however, he had a friend who was an investigator who might have "chased

-4-

a couple of rabbits for [him]" on this case. He recalled that "[t]he key evidence was that they found [the petitioner's] DNA in the young lady's vagina."

Counsel recalled that the victim had recanted her original statements that the petitioner raped her; however, he stated that the victim later "recanted [her] recantation" and again maintained that she was raped. Although he did not have an independent recollection of a letter written by the victim stating that the rape never occurred, he "[felt] that [he] would have" introduced the letter into evidence during the trial.

Counsel stated that he wanted to pursue a theory of the case where "what had happened was that the [victim] had turned eighteen. She knew she was about to lose her home because she was no longer eligible to be a foster child. And if perhaps she had enticed . . . [the petitioner] into having sex with her thinking maybe I can, you know, can stay here. And, when that didn't happen, then all of a sudden it became rape." He wanted to pursue this theory of the case because he "always thought . . . [the victim's] story varied a little bit and didn't make sense." However, the petitioner maintained that "it never happened under any circumstances and he never had sex with her," and counsel adopted the petitioner's theory.

Counsel testified that, because he could not discount the DNA evidence under the petitioner's theory, he was "kind of in a corner." He explained that maintaining that the petitioner never had sex with the victim, despite the fact that his DNA was identified in her vagina, "was the most awkward defense to try to go with, given the State's proof." Counsel testified that he filed an *ex parte* motion with the trial court to hire an independent expert to perform an independent test of the DNA sample. The trial court granted his motion, and the independent expert "came to the same conclusion, that the sample matched the DNA of [the petitioner]." Counsel did not file a suppression motion alleging that the petitioner's sample DNA, used by the TBI to compare with the DNA in the vaginal swab, was taken through an unconstitutional seizure because "had [he] objected to the initial sample that was taken, the State would have simply turned around and gotten a search warrant and gotten a sample. We would have been right back to square one."

The post-conviction court, in a written order, denied the petitioner's request for post-conviction relief. As for petitioner's claim that counsel was deficient in failing to file a motion to suppress, the post-conviction court noted, "Petitioner did not make the search warrant an exhibit in this case; therefore the Court cannot review the issue in terms of the prejudice this issue may have caused." The post-conviction court found unavailing petitioner's claim that counsel "failed to challenge effectively the DNA evidence." The post-conviction court noted that counsel had the DNA evidence independently tested and that counsel "made a strategic decision not to challenge the veracity of the evidence" because it would be difficult for counsel "to present a persuasive witness to challenge what [the petitioner's] own expert had concluded." The post-conviction court also found that the petitioner did not present evidence to support his claims that counsel was deficient in failing to challenge the method of DNA testing and the chain of custody of the DNA samples.

The post-conviction court further found that counsel did not perform deficiently by failing to investigate the victim's background because "counsel felt the DNA evidence was overwhelming and made a tactical decision not to irritate the jury by berating the victim about her background when he did not have an explanation for the DNA evidence." Because the evidence indicated that counsel both introduced the letter to DCS with the victim's recantation and cross-examined her regarding her recantations, the post-conviction court dismissed the petitioner's issue claiming that counsel was ineffective in offering proof of the victim's recantations.

The petitioner filed a timely notice of appeal, and he presents as his sole issue "[w]hether Trial Counsel was ineffective for failing to challenge the most crucial piece of evidence against his client where the method of testing that evidence was questionable."

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). The error must be so serious as to render an unreliable result. *Id.* at 687, 104 S. Ct. at 2064. It is not necessary, however, that absent the deficiency, the trial would have resulted in an acquittal. *Id.* at 695, 104 S. Ct. at 2068. Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

*Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of

counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

The petitioner notes that Code section 24-7-118(b)(2) provides that, with regard to DNA evidence, "parties are . . . allowed to challenge a particular DNA test through competing experts, cross-examination, and the like," and he argues that counsel "only briefly cross-examined the State's DNA expert, and then only regarding probabilities" and that he "did not challenge the protocols, testing methods, or otherwise challenge the State's findings." The petitioner contends that such failure amounted to ineffective assistance of counsel. We disagree.

First, the record clearly indicates that counsel sought independent DNA analysis through an *ex parte* motion for expert assistance. Counsel convinced the trial court that an independent analysis of the DNA was needed, and he had the DNA sample independently tested. Clearly, counsel sufficiently "challenged" the DNA evidence. We cannot find that counsel was ineffective simply because his independent expert agreed with the TBI analysis that the DNA matched the petitioner's. Although the petitioner argues that five matching loci is not sufficient to be recognized by the Federal Bureau of Investigation's national database, he cannot contest that "the probability of the sperm being from another African American other than the [petitioner] was 1/3,517,000."

The petitioner also stresses the fact that, although Agent Minor explained that one nanogram was the "ideal" DNA sample, the sample analyzed in this case was only .062 nanograms. The petitioner contends that "[w]hile this number alone might sound meaningless, the State's expert testified that it represented about one-twentieth of the size that was optimal to test." However, Agent Minor also testified that he had successfully tested and processed smaller samples of DNA, that the TBI laboratory had no record of false identifications, and that he considered the results to be "very reliable."

We find that the petitioner has not shown either prong of the *Strickland* analysis by clear and convincing evidence, and, therefore, we affirm the post-conviction court's denial of his petition. Nothing in the evidence or petitioner's brief suggests that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." *Baxter*, 523 S.W.2d at 936. Counsel attempted to use an independent expert to challenge the DNA, and, as the post-conviction court noted, we will not upset counsel's tactical decision not to attack the State's analysis of the DNA evidence when his own expert arrived at the same conclusions. Furthermore, even if counsel's performance was somehow deficient, we cannot say that such deficiencies adversely

affected the litigation. Agent Minor convincingly explained how he satisfactorily analyzed a small amount of DNA through amplification, and he testified that the results were "very reliable." In the post-conviction hearing, the petitioner failed to contradict by evidence Agent Minor's testimony. As the petitioner acknowledges in his brief "'the PCR method of DNA analysis [is] an inherently trustworthy and reliable method of identification.'" *See State v. Begley*, 956 S.W.2d 471, 477 (Tenn. 1997). We cannot find that, had counsel made the arguments put forth by the petitioner, he would have been able to overcome this "presumption of reliability" and materially affect the petitioner's defense.

*Conclusion*

Because petitioner cannot show that counsel performed below the range of competence demanded of attorneys in criminal cases or that any deficient performance by counsel materially affected his defense, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE