IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JANUARY 1999 SESSION

FILED

May 5, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| STATE OF TENNESSEE, | ) | C.C.A. NO.  03C01-9802-CC-00080 |
| | ) | |
| Appellee | ) | RHEA CIRCUIT |
| | ) | |
| v. | ) | HON. BUDDY D. PERRY, |
| | ) | JUDGE |
| JOHN A. CHAPMAN, | ) | |
| | ) | (First Degree Murder, Aggravated |
| Defendant/Appellant | ) | Rape, Aggravated Robbery) |


FOR THE APPELLANT

Howell G. Clements
Spears, Moore, Rebman & Williams, P.C.
P.O. Box 1759
Chattanooga, TN  37401

Jane M. Stahl
Shumacker & Thompson, P.C.
701 Market Street, Suite 500
Chattanooga, TN  37402

FOR THE APPELLEE

John Knox Walkup
Attorney General & Reporter

Erik W. Daab
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Nashville, TN  37243


OPINION FILED _____



AFFIRMED

JOHN K. BYERS
SENIOR JUDGE

## O P I N I O N

On October 16, 1997, the defendant was found guilty in a jury trial of first degree murder, aggravated rape, and aggravated robbery. He was sentenced to serve life imprisonment for first degree murder to run concurrently with fifteen years for aggravated rape and twelve years for aggravated robbery. These sentences were ordered to be served consecutively to sentences the defendant had previously received for first degree murder, aggravated sexual battery, and aggravated kidnapping.[1]

The defendant raises the following issues on appeal:

I.      Whether the evidence was sufficient to support the convictions of first degree murder, aggravated rape, and aggravated robbery.

II.     Whether the trial court erred when it granted eight (8) peremptory challenges to the State when the Tennessee Rules of Criminal Procedure in effect at the time of the indictment permitted only four (4) peremptory challenges to the State.

III.    Whether the trial court erred in allowing the admission of unreliable DNA evidence and gruesome photographs of the crime scene and in refusing to allow the defendant to introduce polygraph results that tended to inculpate another individual who was a suspect of the investigation.

IV.    Whether the trial court erred in ordering the sentences imposed in this case to run consecutively to the sentences imposed for the defendant's previous convictions.

The judgment of the trial court is affirmed.

### BACKGROUND

On June 7, 1992, Vickie Sue Metzger, the victim in this case, began driving her white, Chevrolet car from her home in Jeffersonville, Indiana to Atlanta, Georgia. She planned to attend a conference and intended to arrive in Atlanta before 5:00 p.m. The victim was a 41 year old woman who worked as a financial manager and had been a Benedictine nun for 22 years. Ruth Metzger, the victim's mother,

---

[1] For the facts surrounding these convictions, see *State v. John Allen Chapman,* No. 01C01-9604-CC-00137, Grundy County (Tenn. Crim. App. Sept. 30, 1997).

testified that she received a call the next morning inquiring about her daughter's whereabouts because she did not appear at the conference.

In the early morning hours of June 11, 1992, the victim's locked car was found parked at the east bound rest area in Monteagle, Tennessee off Interstate 24.[2] A few hours later, Roy Sain, a criminal investigator for the Grundy County Sheriff's Department, discovered the victim's body in the woods approximately 1100 feet from where her car was parked. Mr. Sain testified that the body was covered with leaves and branches and was clothed with a bra, pants, and panties. Mr. Sain also testified that this particular rest area is heavily trafficked, especially by trucks, and that this traffic creates so much noise that it is difficult to hear at the rest area.

Immediate searches of the surrounding area failed to recover the victim's blouse, shoes, purse, credit cards, or car keys. Ricky Harrison testified that in December 1996 he was hunting in the area when he found the victim's credit cards and compact or pill container behind a fence[3] in the woods. A further search behind the fence located the victim's traveler's checks, change, business card holder, business cards, pocket knife, car keys, and makeup.

During the investigation of the victim's death, Larry Davis, a special agent with the Tennessee Bureau of Investigation, learned that John A. Chapman, the defendant, had been working at the east bound rest area in Monteagle on June 7, 1992. On July 13, 1992, the defendant gave a sworn statement to Mr. Davis and voluntarily submitted a blood sample. On the same day, Mr. Davis also obtained a sworn statement and voluntary blood sample from Johnny Hood, who worked at the west bound rest area in Monteagle on June 7, 1992. Mr. Davis testified that he delivered both of the blood samples to the TBI crime lab.

Johnny Butner, the supervisor of the rest area, testified that the defendant's job as a janitor required him to keep the rest rooms and parking lot clean and to

---

[2] It was stipulated that the victim used her BP credit card to purchase $13.85 in gas in Manchester, Tennessee at 2:49 p.m. on June 7, 1992. Mr. Sain testified that the distance from the BP station in Manchester to the rest area in Monteagle is 23 ½ miles.

[3] An eight foot chain link fence surrounded the rest area. The victim's body was found approximately 230 feet from one side of the fence and her personal possessions were found approximately 104 feet across another side of the fence.

keep the grass mowed. Mr. Butner testified that the defendant worked alone at the east bound rest area from 7:00 a.m. to 7:00 p.m. on June 7, 1992. The defendant then worked from 7:00 a.m. to 3:00 p.m. on June 8, 1992 and next worked June 13, 1992. Mr. Butner explained that the defendant's employment application stated that he had undergone back surgery and could not lift more than 50 pounds.

Mr. Butner further testified that Johnny Hood, a part time janitor, worked at the west bound rest area from 7:00 a.m. to 7:00 p.m. on June 7, 1992 and that he did not work again until June 13, 1992. Mr. Butner stated that he fussed at Mr. Hood for being at the east bound rest area on June 13, 1992, explaining that he was not supposed to be at the east bound rest area while he was on duty at the west bound rest area.

Mr. Hood testified that he knew the defendant from work and that they would carpool to and from work. Mr. Hood stated that he would walk over to the east bound rest area about everyday, explaining that the job was boring so he would go over to talk. He also testified that on June 7, 1992 he went over to the east bound rest area at 11:00 a.m. and again at 3:00 p.m. Mr. Hood stated that on June 7, 1992 he picked the defendant up for work and took him home. He further testified that on the way home from work he did not notice anything unusual about the defendant, did not notice whether the defendant was muddy or scratched, and did not notice the defendant with a purse or jewelry.

The victim's body was sent to Nashville for an autopsy. Dr. Gretel Harlan, a forensic pathologist, performed the autopsy on June 12, 1992. It was stipulated that the body was positively identified as Vickie Sue Metzger. Dr. Harlan testified that she obtained vaginal and anal swab samples from the victim in order to test for the presence of semen.

The blood samples from the defendant and Mr. Hood and the samples from the victim's body were initially analyzed by Shelly Betts, a forensic scientist with the TBI.[4] Ms. Betts testified that at the time she worked on this case her speciality was

---

[4] Ms. Betts also examined the victim's car, her clothes, her fingernail scrapings, and her hair samples, as well as coveralls and tree limb cutters, but she was not able to obtain useful evidence from any of these items.

in the field of forensic serology. The vaginal swab sample from the victim consisted of vaginal and seminal fluids. Ms. Betts explained that ABO blood typing can be determined from such bodily fluids if a person is a "secretor."[5] She further explained that 80 percent of the population are secretors, meaning that they have chemicals in their bodily fluids, such as saliva or semen, which indicate their blood type.

Ms. Betts determined that the defendant's blood type was B and that he was a secretor. She also determined that Mr. Hood's blood type was O and that he was a secretor. It was stipulated that the victim's blood type was A, but Ms. Betts did not know whether the victim was a secretor. Ms. Betts testified that her testing of the fluids from the vaginal swab sample revealed the presence of A and H antigens.

Based on all of these tests, Ms. Betts testified that there was no evidence in the fluids from the vaginal swab sample that B antigens were present in the victim's vagina, concluding that this result would not have been consistent with the defendant being the depositor of the semen. However, she explained that the presence of A and H antigens could have come from the victim since she had a blood type of A. Based on several scientific publications, Ms. Betts also explained that a false reading could have occurred from the presence of bacteria, which can produce human antigen types.[6] Finally, she stated that she was not aware that the victim was clothed from the waist down.

Next, Dr. Harold A. Deadman, a former agent in the DNA Analysis Unit with the Federal Bureau of Investigation, performed the DNA analysis in this case.[7] He stated that the purpose of DNA analysis is to exclude individuals as being potential

---

[5] Dr. Harlan testified that if a person is a secretor:
a person with an O blood type will secrete H antigen;
a person with an A blood type will secrete A or H antigens;
a person with a B blood type will secrete B or H antigens; and
a person with an AB blood type will secrete A, B, or rarely H antigens.

[6] Testifying for the defense, Dr. Jay F. Lewis explained that in order to draw an antigen type from bacteria a complex extraction method, which includes adding chemicals to the sample, must be used. Therefore, Dr. Lewis stated that Ms. Betts' routine serological tests could not have resulted in a false antigen type reading.

[7] The complexities of DNA structure and DNA analysis are well explained by Judge Hayes in *State v. John Allen Chapman,* No. 01C01-9604-CC-00137, Grundy County (Tenn. Crim. App. Sept. 30, 1997). *See also McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257 (Tenn. 1997).

contributors of an unknown sample of evidence. Dr. Deadman explained that a DNA "match" is a statement of consistency and not an absolute identification, meaning that a particular person could not be excluded as the contributor of the DNA. After a match is found, he explained that a statistical analysis is performed to estimate the frequency of other individuals in the general population having matching DNA.

In performing the DNA analysis in this case, Dr. Deadman explained that he conducted six different tests to compare the DNA in the known blood samples of the victim, the defendant, and Mr. Hood with the DNA in the unknown samples of sperm from the victim's body.[8] In two of these tests, he found that the defendant's blood DNA matched the sperm DNA and therefore concluded that the defendant was a potential contributor or, in other words, could not be excluded as contributing the sperm DNA. He also determined that Mr. Hood was excluded as being the contributor of the sperm DNA. Although the other four test results were too weak to measure and therefore inconclusive for matching purposes, Dr. Deadman testified that the defendant was still not excluded as being the contributor of the sperm DNA based on his review of the tests.

Based on a combination of the two positive test results, Dr. Deadman testified that the statistical probability that the defendant contributed the sperm DNA was 1/5000, meaning that 99.98 percent of the Caucasian population could be excluded as contributing the sperm DNA. He further explained that this probability was twice as small because the contributor of the sperm had to be a male.

## SUFFICIENCY OF THE EVIDENCE

The defendant challenges the sufficiency of the evidence to support his convictions of first degree murder, aggravated rape, and aggravated robbery. He contends that the scientific evidence absolutely excluded him as the perpetrator of

---

[8] Dr. Deadman explained that he separated the sperm DNA from the victim's DNA in the unknown sample from the victim's body.

these crimes. The State maintains that the scientific evidence, specifically the DNA evidence, supported all three of his convictions beyond a reasonable doubt.

When the sufficiency of the evidence is challenged, the standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could find the accused guilty of the crime beyond a reasonable doubt. *State v. Duncan,* 698 S.W.2d 63, 67 (Tenn. 1985), *cert. denied,* 475 U.S. 1031 (1986). Furthermore, "a jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory." *State v. Williams,* 657 S.W.2d 405, 410 (Tenn. 1983), *cert. denied,* 465 U.S. 1073 (1984); *State v. Grace,* 493 S.W.2d 474, 476 (Tenn. 1973).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, this Court may not reweigh or reevaluate the evidence. *Id.*

A finding of guilt against the defendant removes the presumption of innocence and raises a presumption of guilt on appeal. *Grace,* 493 S.W.2d at 476. It is the defendant who must overcome this presumption of guilt and carry the burden of demonstrating that the evidence is insufficient. *Williams,* 657 S.W.2d at 410.

Convictions may be based solely on circumstantial evidence. *State v. Howell,* 868 S.W.2d 238, 253 (Tenn. 1993) (citations omitted), *cert. denied,* 510 U.S. 1215 (1994). In this case, the State's case rested entirely on circumstantial evidence. However, before an accused may be convicted on circumstantial evidence alone, the facts must be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." *Id.*

The jury found the defendant guilty of first degree murder pursuant to Tenn. Code Ann. § 39-13-202(a)(1) (1991). At the time of the offense, "an intentional, premeditated and deliberate killing of another" constituted first degree murder. Tenn. Code Ann. § 39-13-202(a)(1) (1991). The criminal code defined a deliberate act as "one performed with a cool purpose" and a premeditated act as "one done

after the exercise of reflection and judgment." Tenn. Code. Ann. §§ 39-13-201(b)(1), (2) (1991).

Next, the jury convicted the defendant of aggravated rape pursuant to Tenn. Code Ann. § 39-13-502(a) (1991). At the time of the offense, aggravated rape was defined in relevant part as the "unlawful sexual penetration of a victim by the defendant . . . accompanied by [either] of the following circumstances: (1) [f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon; [or] (2) [t]he defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a) (1991). Coercion is defined in relevant part as the "threat of kidnapping, extortion, force or violence to be performed immediately or in the future . . . ." Tenn. Code Ann. § 39-13-501(1) (1991). Sexual penetration, of course, includes "sexual intercourse." Tenn. Code Ann. § 39-13-501(7) (1991). Finally, bodily injury means "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2) (1991).

Finally, the jury found the defendant guilty of aggravated robbery pursuant to Tenn. Code Ann. § 39-13-402(a) (1991). At the time of the offense, aggravated robbery was defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" and "(1) [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401(a), 39-13-402(a) (1991).

Based upon the facts set out above, both circumstantial and scientific, we find the evidence supports the verdict of the jury in finding the defendant guilty of these offenses beyond a reasonable doubt.

A rational trier of fact could have concluded that the defendant had the opportunity to commit and the means to cover up the crimes based on his presence at the rest area on June 7 and 8, 1992. In addition, a rational trier of fact could have concluded that he was the perpetrator of the crimes based on the sperm DNA from

-8-

the victim's vagina matching the DNA from his blood sample. More than 99.98 percent of the Caucasian population, including Mr. Hood, was excluded as being potential contributors of the semen found in the victim's vagina. The difference in the testimony among the expert witnesses concerning the antigens found in the victim's vagina and the effect thereof was for the jury to determine from all of the evidence. Their verdict resolves this in favor of the State, and the evidence is sufficient to support their conclusion.

We find that the proof in the record points the finger of guilt unerringly at the defendant and the defendant alone. Further, the defendant did not carry the burden of proving that this evidence was insufficient.

## ADMISSIBILITY OF EVIDENCE

### DNA Evidence

Prior to trial, the defendant filed a motion in limine asking the trial court to exclude the DNA analysis results in this case. During a lengthy hearing on the subject, the trial court considered the testimony of Dr. Deadman, which was similar to the testimony at trial set out above. The trial court ruled that the expert testimony concerning the DNA analysis was admissible.

On appeal, the defendant contends that the trial court did not properly apply Rules 702, 703, and 403 of the Tennessee Rules of Evidence in allowing the State to introduce the expert testimony on the DNA analysis. Specifically, the defendant argues that Dr. Deadman's testimony regarding the statistical ratios on the two matching test results were too low to be scientifically reliable and that his testimony regarding the other four immeasurable test results was unduly prejudicial.

Before expert testimony regarding DNA analysis may be admitted into evidence, it must meet the standards set forth in Rules 702 and 703 of the Tennessee Rules of Evidence. *See* Tenn. Code Ann. § 24-7-117(b)(1) (Supp. 1991); *State v. Begley,* 956 S.W.2d 471, 476 (Tenn. 1997). Rule 702 states:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 703 adds that: "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate a lack of trustworthiness."

The requisite foundations which must be established prior to the admission of expert testimony are that (1) the facts underlying the testimony must be reasonably relied upon by experts in the particular field and (2) the facts must be trustworthy. Tenn. R. Evid. 703, Advisory Commission Comments. Pursuant to Tenn. Code Ann. § 24-7-117(b)(1) (Supp. 1991), DNA evidence is statutorily regarded as reliable and trustworthy. *State v. Begley,* 956 S.W.2d at 477. Further, determinations regarding qualifications, admissibility, relevancy, and competency of expert testimony rest within the sound discretion of the trial court and will only be disturbed upon a showing of an abuse of discretion. *State v. Ballard,* 855 S.W.2d 557, 562 (Tenn. 1993).

We conclude that the trial court properly followed the Tennessee Rules of Evidence and did not abuse its discretion in allowing the State to introduce the expert testimony regarding the DNA analysis. In addition, the probative value of this evidence outweighed any prejudicial effect.

### Photographs

Through a motion in limine prior to trial, the defendant sought to exclude the photographs of the victim's body. The trial court decided to rule on this issue at trial. At trial, the trial court overruled the defendant's objection to the photographs and determined that the probative value of the photographs outweighed any prejudicial effect.

On appeal, the defendant contends that the trial court erred in admitting the photographs because the danger of unfair prejudice substantially outweighed their limited probative value according to Rule 403 of the Tennessee Rules of Evidence. Specifically, the defendant argues that the photographs of the badly decomposed body were gruesome, shocking, and horrifying.

The decision of whether to admit a photograph into evidence "lies within the discretion of the trial court whose ruling in this respect will not be overturned on appeal except upon a clear showing of an abuse of discretion." *State v. Banks,* 564

S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Further, photographs of the victim in a murder case are admissible "if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Id.* at 951.

We agree with the trial court that the probative value of the photographs outweighed any prejudicial effect. In this case, the photographs illustrated the location, covering, and dress of the victim's body and corroborated the State's theory that she was murdered, raped, and robbed. Furthermore, the defendant has failed to demonstrate any abuse of discretion by the trial court in admitting the photographs.

**Polygraph Results**

The defendant contends that the trial court erred in denying his request to cross examine Larry Davis, the TBI agent, about the inconclusive results of a polygraph test taken by Johnny Hood, the janitor who worked at the west bound rest area on June 7, 1992. The defendant further contends that this denial deprived him of his constitutional right to confront witnesses under the 14th Amendment of the U.S. Constitution.

In *Irick v. State,* 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998) (citations omitted), *cert. denied,* 119 S.Ct. 219 (1998), this Court stated that "[i]t has long been established in Tennessee that the results of a polygraph examination are not admissible as evidence in a criminal prosecution." This Court further commented that "[t]he courts of this state have consistently held that the results of such tests are 'inherently unreliable'." *Id.* at 653.

In keeping with the holdings of Tennessee courts regarding the inadmissibility of polygraph results, we conclude that the trial court properly denied the defendant's request to cross examine Mr. Davis about the polygraph results of Mr. Hood.

**PEREMPTORY CHALLENGES**

The defendant contends that at the time of the offense the rule in effect only gave the State four peremptory challenges compared to the defendant's eight peremptory challenges. *See* Rule 24(d), Tenn. R. Crim. P. (1992). By the time of trial, however, the rule had been changed to allow the State eight peremptory

challenges. *See* Rule 24(d), Tenn. R. Crim. P. (1997). We find that the trial court properly permitted the State eight peremptory challenges because it was applying a procedural rule that had been amended after the commission of the crimes in this case. *See State v. Pike,* 978 S.W.2d 904, 926 (Tenn. 1998).

In addition, the defendant argues that he was prejudiced by the trial court's evidentiary errors regarding the DNA evidence, photographs, and polygraph results. However, the defendant has failed to demonstrate how the trial court's evidentiary rulings, all of which we have upheld, prejudiced him in relation to the State's use of additional peremptory challenges. There is no evidence to indicate that an impartial jury rendered an unfair verdict as a result of the application of the amended procedural rule. *See State v. Wingard,* 480 S.W.2d 915, 918 (Tenn. 1972).

**SENTENCING**

The defendant contends that the trial court erred in sentencing him to the maximum of twelve years for aggravated robbery. In addition, the defendant alleges that the trial court improperly found him to be a dangerous offender and therefore erred in ordering his sentences in the present case to run consecutively to his previous convictions.

**Aggravated Robbery Sentence**

Normally, this Court is required to review the length, range, or manner of service of a sentence *de novo* on the record, accompanied by a presumption that the determinations of the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). However, where the trial court failed to state the mitigating and enhancement factors relied upon, there is no presumption of correctness on appeal and review is *de novo* upon the record. *State v. Jones,* 883 S.W.2d 597, 600 (Tenn. 1994); *see also* Tenn. Code Ann. § 40-35-210(f) (1997).

In this case, the trial judge did not set forth the enhancement and mitigating factors that he relied upon to sentence the defendant to the maximum of twelve years for aggravated robbery. Therefore, we must conduct a *de novo* review of the defendant's sentence upon the entire record. *Id.* In making our review, we must consider the following:

(1) The evidence, if any, received at trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and

(6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (1997).

Regarding the maximum sentence of twelve years for aggravated robbery, the defendant points out that the presumptive sentence for aggravated robbery, which is a Class B felony, "shall be the minimum sentence in the range if there are no enhancement or mitigating factors." Tenn. Code Ann. § 40-35-210(c) (1997). The burden is on the defendant, the appealing party, to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d) (1997), Sentencing Commission Comments.

At the time of the offense in this case, aggravated robbery was defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" and "(1) [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401(a), 39-13-402(a) (1991). As a Class B felony, aggravated robbery carries a sentence in the range of "not less than eight (8) nor more than twelve (12) years." Tenn. Code Ann. §§ 39-13-402(b) (1991), 40-35-112(2) (1990). Pursuant to Tenn. Code Ann. § 40-35-210(e) (1990), "[s]hould there be enhancement and mitigating factors, the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors."

At the sentencing hearing, the defendant's prior convictions for first degree murder, aggravated kidnapping, and aggravated sexual battery were introduced into

-13-

evidence.  Also, the defendant's presentence report listed numerous prior convictions for weapons offenses, drug offenses, and serious driving offenses. Therefore, we find that the following enhancement factors, listed in Tenn. Code Ann. § 40-35-114 (1990), apply to the defendant's aggravated robbery conviction:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
>
> (8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;
>
> (10) The defendant had no hesitation about committing a crime when the risk to human life was high.

As mitigation evidence at the sentencing hearing, the defendant called two witnesses who essentially testified that the defendant had always been a nice and helpful person to others and had always supported and cared for his young son. Pursuant to Tenn. Code Ann. § 40-35-113(13) (1990), the defendant also filed a notice of the following mitigating factors:  (1) "[t]he defendant served in the National Guard" and (2) "[t]here was no significant criminal history or criminal convictions at the time of the alleged defense [sic]."

The defendant's assertion that he had no significant criminal history or criminal convictions at the time of the alleged offense is clearly refuted by the evidence introduced regarding the defendant's numerous and serious prior convictions.  We give little weight to the mitigating factor that the defendant served in the National Guard.  Further, any mitigating evidence that the defendant supported and cared for his young son is inapplicable.[9]

There is no question that the enhancement factors outweigh the single mitigating factor offered by the defendant.  Further, the defendant has failed to carry his burden that the maximum twelve year sentence for aggravated robbery is

---

[9] In *State v. John Allen Chapman,* No. 01C01-9604-CC-00137, Grundy County (Tenn. Crim. App. Sept. 30, 1997), this Court found the same mitigating evidence to be inapplicable because it is not consistent with the purpose of Tenn. Code Ann. § 40-35-113(13) (1990), and because support of a dependent is an obligation and a duty by law, *see* Tenn. Code Ann. § 34-11-102(a) (1996).

improper. Therefore, we find that the sentence imposed by the trial court for the aggravated robbery stands.

## Consecutive Sentencing

Our review is again *de novo* on the record without a presumption of correctness on appeal. *See State v. Shelton,* 854 S.W.2d 116,123 (Tenn. Crim. App. 1992). In this instance, the trial court did not state the specific findings of fact that he used to order consecutive sentencing. *See* Tenn. Code Ann. §§ 40-35-209(c), 40-35-210(f) (1990).

In arguing that the defendant's sentences in the present case should run consecutive to his sentences for previous convictions, the State asserted that Tenn. Code Ann. § 40-35-115(b)(4) (1990) was applicable. This section provided that the trial court may order consecutive sentencing if it is determined that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (1990).

In *Gray v. State,* 538 S.W.2d 391, 393 (Tenn. 1976), the Supreme Court held that "[a] defendant may be classified as a dangerous offender if the crimes for which he is convicted indicate that he has little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." We conclude that the defendant should be classified as a dangerous offender based on the dangerous nature of the instant offenses, as well as the dangerous nature of his previous offenses. Without question, the crimes of murder and rape indicate little or no regard for human life and no hesitation about committing a crime where the risk to human life is high. Moreover, we determine that in this case "the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." *State v. Wilkerson,* 905 S.W.2d 933, 938 (Tenn. 1995).

## CONCLUSION

We find that there are no reversible errors and conclude that the defendant's convictions and sentences are affirmed.

_____
                                                       John K. Byers, Senior Judge

CONCUR:

_____
James Curwood Witt, Jr., Judge


_____
Norma McGee Ogle, Judge